UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| REBECCA A. HADDON,      *Plaintiff*, | )<br>)<br>) |
| *vs*. | )    2:12-cv-00203-JMS-WGH<br>) |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF THE SOCIAL SECURITY<br>ADMINISTRATION,<br>      *Defendant*. | )<br>)<br>)<br>) |

### **ENTRY REVIEWING THE COMMISSIONER'S DECISION**

*Pro se* Plaintiff Rebecca A. Haddon applied for a period of disability and disability insurance benefits, as well as supplemental security income, from the Social Security Administration ("SSA") on February 3, 2011. After a series of administrative proceedings and appeals, including a hearing in May 2012 before Administrative Law Judge ("ALJ") Henry Kramzyk, the ALJ issued a finding on May 10, 2012 that Ms. Haddon was not entitled to disability insurance benefits or supplemental security income. In June 2012, the Appeals Council denied Ms. Haddon's request for a review of the ALJ's decision, rendering that decision the final decision of the Defendant, Commissioner of the Social Security Administration ("the Commissioner"), for the purposes of judicial review. 20 C.F.R. § 404.981. Ms. Haddon then filed this action under 42 U.S.C. § 405(g), requesting that the Court review the Commissioner's denial.

### I.
#### RELEVANT BACKGROUND

Ms. Haddon was fifty years old at the time of her disability application on February 3, 2011. [Dkt. 11-5 at 2, 6.] She completed a bachelor's degree, and is currently working toward her master's degree in healthcare administration. [Dkt. 11-2 at 38.] Ms. Haddon worked until

January 2011 in various positions, most recently as a qualified developmental disability profession. [*Id.* at 38-41.] Her alleged onset date is January 7, 2011, [dkt. 11-5 at 2], and she claims she is disabled for a variety of impairments which will be discussed as necessary below.[1] She will be last insured for purposes of disability on December 31, 2015. [Dkt. 11-2 at 12.]

Using the five-step sequential evaluation set forth by the SSA, the ALJ issued an opinion on May 10, 2012. [*Id.* at 12-25.] The ALJ found as follows:

- At Step One of the analysis, the ALJ found that Ms. Haddon had not engaged in substantial gainful activity[2] since the alleged onset date of her disability. [*Id.* at 14.]

- At Step Two, the ALJ found that Ms. Haddon suffered from depressive disorder and general anxiety disorder. The ALJ further concluded that Ms. Haddon also suffered from the non-severe impairment of obesity and the non-medically determinable impairments of Post-Traumatic Stress Disorder ("PTSD") and Osteoporosis. [*Id.* at 14-15.]

- At Step Three, the ALJ found that Ms. Haddon did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. The ALJ concluded that Ms. Haddon had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but found that Ms. Haddon needed certain nonexertional limitations. Specifically, the ALJ found that Ms. Haddon can understand, remember, and carry out short, simple, repetitive instructions; sustain attention and concentration for two hour periods at a time and for eight hours in a workday on short, simple, repetitive instructions; use judgment in making work decisions related to short, simple, repetitive instructions, requires an occupation with only occasional coworker contact or supervision and with set routine and procedures, with few changes during the workday and with only superficial contact with the public on routine matters; must avoid fast paced production work; can maintain regular attendance and be punctual within customary tolerances; and can perform activities within a schedule. [*Id.* at 16-23.]

---

[1] The ALJ notes in his opinion that Ms. Haddon filed for benefits on January 19, 2011, [*see, e.g.*, dkt. 11-2 at 12, 25], but the record indicates that she actually applied on February 3, 2011, [dkt. 11-5 at 2, 6].

[2] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a) and § 416.972(a).

- At Step Four, the ALJ found that Ms. Haddon is not capable of performing her past relevant work as a social service aid, caseworker, social welfare administrator, or case-work supervisor, but can perform work as a day worker, industrial cleaner, marker, and housekeeping cleaner. [*Id.* at 23-24.]

Based on these findings, the ALJ concluded that Ms. Haddon was not entitled to receive disability insurance benefits or supplemental security income. [*Id.* at 25.]

On May 25, 2012, Ms. Haddon requested that the Appeals Council review the ALJ's decision. [*Id.* at 8.] On June 13, 2012, the Appeals Council denied Ms. Haddon's request for review. [*Id.* at 2-4.] Accordingly, the Appeals Council's decision became the final decision of the Commissioner for the purposes of judicial review.

## II.
### STANDARD OF REVIEW

The Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court *must* affirm the denial of benefits. Otherwise the Court will remand the matter back to the SSA for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> To evaluate a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant…currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment…one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment,…can [he] perform h[is] past relevant work, and (5) is the claimant…capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).  After Step Three, but before Step Four, the ALJ must determine a claimant's RFC, which represents the claimant's physical and mental abilities considering all of the claimant's impairments.  The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 416.920(e).

### III.
#### DISCUSSION

The Court notes at the outset that Ms. Haddon is proceeding *pro se*, and that it is difficult to discern exactly what arguments she is making in support of her appeal.  The Court will address the arguments it is able to identify from Ms. Haddon's briefs in turn.

**A.  Step Two Challenge**

In connection with the ALJ's finding that Ms. Haddon suffers from depressive disorder and anxiety, Ms. Haddon argues that she also suffers from the severe impairments of PTSD and Osteoporosis.  [Dkt. 14 at 2.]  Specifically, she argues that her PTSD – along with her major depressive disorder and anxiety – "interfere[s] on a daily basis with cognition, [and] consistent use of sound decision making," and causes "anxiety/panic attacks."  [*Id.*]  She asserts that "a diagnosis of [PTSD] and Osteoporosis does exist in my medical record" and treatment for Osteoporosis has been prescribed, but she goes on to argue that a January 2010 medical exam does not note an

impairment of Osteoporosis because she was unemployed and could not afford to undergo the required medical tests. [*Id.*]

The Commissioner responds that there is no evidence in the record that Ms. Haddon was diagnosed with PTSD or Osteoporosis during the period of alleged disability and that, even assuming such diagnoses existed, there is no evidence that those conditions caused functional limitations. [Dkt. 17 at 8-9.] Ms. Haddon replies simply that she "has proven that [her] impairments are severe." [Dkt. 20 at 2.]

At Step Two, the ALJ was required to determine whether Ms. Haddon had an impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). Once the ALJ determined that Ms. Haddon had a severe impairment – and he actually determined that she had two, depressive disorder and general anxiety disorder – he proceeded to the remaining steps of the evaluation process. 20 C.F.R. § 404.1523; *see also Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010). In connection with those remaining steps, the ALJ was obligated to consider both severe and non-severe impairments. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [appellant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments – including those impairments that in isolation are not severe") (emphasis in original).[3]

This does not mean, however, that the ALJ must consider every condition Ms. Haddon claims she has ever suffered from, where there is no evidence in the record that a medical professional ever diagnosed her with that condition and that she still suffers from that condition. Specifically, "[t]o establish physical or mental impairments, a claimant must present actual medical

---

[3] Ms. Haddon appears to argue that the ALJ should not have considered an impairment of obesity because she does not have a diagnosis of obesity. [Dkts. 14 at 5; 20 at 2.] Any such consideration, however, was harmless as it led to an overinclusive analysis in favor of Ms. Haddon, if anything.

evidence of symptoms, laboratory findings, and other information. A claimant's statement of symptoms is not sufficient to establish the existence of an impairment; some objective evidence should be present." *Stuckey v. Sullivan*, 881 F.2d 506, 508 (7th Cir. 1989).

Ms. Haddon does not point to specific evidence from the record to support her argument that she suffered from PTSD and, indeed, no records exist to support her claim. The only references to PTSD in her medical records involve her own statements to medical providers that she has previously been diagnosed with PTSD. [*See, e.g.*, dkt. 11-7 at 72 (notes from July 12, 2011 medical exam by Dr. Wang indicate "[t]he claimant was diagnosed with…[PTSD] in 1998"); 81 (Disability Determination Interview and Mental Status Exam indicates "[i]n 2008, [Ms. Haddon] reports being diagnosed with…PTSD by psychiatrist, Dr. Gonzales").] This evidence does not indicate that she was suffering from PTSD at the time of her disability application.

As for Osteoporosis, Dr. Wang noted in connection with a July 12, 2011 medical exam under "Past Medical History" that Ms. Haddon had Osteoporosis, had a bone scan, had been treated with Actonel in the past, but right now "[s]he takes calcium." [*Id.* at 72.] He went on to list Osteoporosis under "Impression," and stated that Ms. Haddon "may need some restriction for weight lifting and carrying due to low back pain and osteoporosis." [*Id.* at 76-77.] Dr. Roberts-Pittman noted Osteoporosis as a "Diagnosis" in her July 14, 2011 Disability Determination Interview and Mental Status Exam, [*id.* at 87], but the doctor appears to have just been listing physical diagnoses Ms. Haddon reported to her and was not one of her treating physicians. Osteoporosis is also listed under Ms. Haddon's past medical history in a Union Hospital Emergency Record from August 2011. [*Id.* at 111.] Other than Dr. Wang's statement that Ms. Haddon may need some restriction due to her Osteoporosis, the other times that Osteoporosis is mentioned in her medical records are simply to note that she was diagnosed with it in the past. Indeed, Dr.

Wang's own records contradict his opinion that Ms. Haddon may need some restrictions due to Osteoporosis. Specifically, he noted that she was treated with Actonel but now just takes calcium, [*id.* at 72], and that she had full muscle strength except for a slight decrease in her left upper extremity, no noted abnormalities in her joints, intact sensations throughout, normal reflexes, and no muscle atrophy, [*id.* at 76].

In short, the Court finds that the ALJ did not err by not considering Osteoporosis and PTSD, as the record does not contain evidence of a current diagnosis or treatment for those conditions.[4]

### B. Step Three Challenge

Ms. Haddon argues in connection with the ALJ's Step Three findings that "[i]ncidents of panic and anxiety occur at a rate of approximately 10-12 times daily, and several days this rate is in excess of 16-20 times daily. In addition, emergency personnel have been called to my place of residence due to suicide attempts. My daughter will need to come and stay with me to assure my safety. My suicide attempts and/or suicide thoughts range from 8-10 times per month but incidents have increased in the last month." [Dkt. 14 at 3.]

The Commissioner responds that the ALJ fully considered "each step of both listings' criteria," and that his "conclusions derived from Plaintiff's testimony, medical opinions, and treatment notes." [Dkt. 17 at 11.] He also argues that, even if the ALJ erred at Step Three, no harm resulted because "a determination of disability at step four or five rectifies any error at step three," and "[a] finding that a claimant can do existing jobs at step five, necessarily shows that the claimant is not disabled." [*Id.* at 11-12.]

---

[4] Ms. Haddon also argues that her major depressive disorder and anxiety are severe, [dkt. 14 at 2], but this is not a basis for overturning the ALJ's decision since the ALJ agreed that Ms. Haddon "has the following severe impairments: depressive disorder and general anxiety disorder…," [dkt. 11-2 at 14].

The ALJ stated that, in order for Ms. Haddon's mental impairments, alone or in combination, to meet or medically equal the criteria of listings 12.04 and 12.06, they must result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." [Dkt. 11-2 at 16.] The ALJ found that Ms. Haddon has mild restrictions in her activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and has not experienced any episodes of decompensation which have been of extended duration. [*Id.* at 16-17.] Accordingly, the ALJ concluded that Ms. Haddon did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. [*Id.*] These findings are supported by the record.

### 1. *Activities of Daily Living*

The ALJ found that Ms. Haddon has mild restrictions in her activities of daily living because, while she reported a lack of interest in her appearance and needing verbal reminders to wash her face and shave, she also reported that she can wash dishes, shower, dress herself, feed herself, prepare simple meals daily, and use the toilet without difficulty, do laundry and clean "with difficulty [and] hardship," and enjoys reading and walking. [*Id.* at 16.] Ms. Haddon does not specifically dispute these findings, and they are supported by the record. [*See, e.g.*, dkts. 11-6 at 32; 11-7 at 74, 86, 89-107.]

Additionally, the Court is mindful that, while an ALJ can consider a claimant's daily activities when assessing her alleged symptoms, the Seventh Circuit Court of Appeals has "cautioned the [SSA] against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft v. Astrue*, 539 F.3d 668, 680 (7th

Cir. 2008) (referencing 20 C.F.R. § 404.1529). The Seventh Circuit has also strongly criticized the common practice of ALJs equating activities of daily living to employment. *Hughes v. Astrue*, 705 F.3d 276, 2013 U.S. App. LEXIS 1012, *6-7 (7th Cir. 2013). Here, however, the ALJ considered Ms. Haddon's activities of daily living in connection with his Step Three analysis, which is not only permitted, but required, in order to fully consider whether Ms. Haddon had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.

### 2. *Social Functioning*

The ALJ found that Ms. Haddon has moderate difficulties in social functioning because, while she reported that she has problems getting along with family, friends, neighbors, and others because she is "sometimes agitated," and that she isolates herself, she also reported that she goes outside five times a week, is able to drive and ride in a car, and can shop in stores, by phone, by mail, and by computer for groceries and gas. [Dkt. 11-2 at 16-17.] Additionally, she reported that she spends time daily with others visiting and talking, and has a "fair" ability to get along with authority figures. [*Id.* at 17.] Again, Ms. Haddon does not dispute those findings, and they are supported by the record. [*See, e.g.*, dkt. 11-6 at 33-36.]

### 3. *Concentration, Persistence, or Pace*

Regarding concentration, persistence, or pace, the ALJ found that Ms. Haddon has moderate difficulties because while she reported difficulties with her memory, completing tasks, concentration, and following instructions, she also reported that she is able to pay bills, count change, handle a savings account, and use a checkbook or money order. [Dkt. 11-2 at 17.] She also reported that reading and photography are some of her hobbies, she does not need to be reminded to go places, and she is able to follow written instructions "pretty well" and spoken in-

structions "fair." [*Id.*] Again, these findings are supported by the record. [*See, e.g.*, dkt. 11-6 at 33-34.]

To the extent that Ms. Haddon's argument regarding the frequency of her panic and anxiety attacks, and suicide thoughts and attempts, relates to the ALJ's finding regarding concentration, persistence, or pace, the Court will address it here. Ms. Haddon does not cite to any medical evidence in the record to support her claim that she has panic or anxiety attacks "10-12 times daily, and several days this rate is in excess of 16-20 times daily," that "emergency personnel have been called to [her] place of residence due to suicide attempts," or that her "suicide attempts and/or suicide thoughts range from 8-10 times per month but incidents have increased in the last month." [Dkt. 14 at 3.] Indeed, the only medical evidence in the record relating to suicidal thoughts or suicide attempts are notations of Ms. Haddon's self-reports. For example, the record indicates that: (1) she reported to Dr. Gonzalez during an October 2, 2008 psychiatric evaluation that she "had been to the emergency room as a result of [panic] attacks," [dkt. 11-7 at 2]; (2) she also reported to Dr. Gonzalez that she "was admitted to Charter Hospital several years ago secondary to major depression with psychotic features…," [*id.* at 3];[5] (3) she reported to Dr. Khan on February 1, 2010 that she "has had prior suicidal attempts," [*id.* at 18]; and (4) she stated during a Disability Determination Interview and Mental Status Exam that at the age of 38, she was hospitalized for "depressive symptoms and hallucinating," [*id.* at 81]. Additionally, the suicidal thoughts or suicide attempts referred to in the medical record all occurred long before she applied for disability benefits, and long before her alleged onset date. They do not support Ms.

---

[5] Ms. Haddon argues that the ALJ's statement that the record does not indicate any hospitalizations related to her psychiatric impairments is "absolutely incorrect and inaccurate information…." [Dkt. 14 at 2.] But the Court's review of the record indicates that the ALJ is correct – there are no medical records reflecting hospitalizations for psychiatric conditions, but only statements from Ms. Haddon or her daughter that such hospitalizations occurred.

Haddon's claim of multiple suicide-related incidents every month, or of emergency personnel being called to her home due to those incidents.

### 4. Episodes of Decompensation

The ALJ found that Ms. Haddon has not experienced any episodes of decompensation, and the Court agrees. Ms. Haddon's simple statement that "[m]y conditions have caused decompensation in overall functioning and presently this is the case," [dkt. 14 at 5], is not enough – she must point to evidence in the record of such decompensation, which she has not done.

In sum, the ALJ's finding at Step Three that Ms. Haddon does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments is supported by the record, and the ALJ built a logical bridge to support his finding.[6]

**C. Step Four Challenge**

Ms. Haddon argues that she is unable to perform her former occupation, and that she also cannot perform any other work within the economy. Because the ALJ agreed with Ms. Haddon that she is unable to perform her past relevant work as a social service aid, caseworker, social welfare administrator, or case-work supervisor, the Court will consider only Ms. Haddon's latter argument. Specifically, Ms. Haddon argues that she cannot perform any work due to the symptoms of depression, including "failing to return phone calls, turning in poor-quality work, missing deadlines altogether, not following up on client needs and issues, indecision, not [being] able to come into work at all, coming in late, leaving early, difficulty getting along with co-workers, [and] withdrawing from the social environment at work." [Dkt. 14 at 4.] She also asserts that

---

[6] Ms. Haddon's argument that she has only been able to pursue sporadic treatment for her psychiatric impairments because she has been unemployed, [dkt. 14 at 3], is unavailing. "An absence of evidence that a claimant sought low-cost or free care may warrant discrediting [her] excuse that [she] could not afford treatment," *Buchholtz v. Barnhart*, 98 Fed. Appx. 540, 546 (7th Cir. 2004). Ms. Haddon presented no such evidence here.

the ALJ should have considered the effects of her allergies, COPD, chest pain, and chronic back pain. [*Id.*]

The Court finds that the ALJ's RFC determination took into account the symptoms of depression that Ms. Haddon discusses – specifically, the ALJ limited her to jobs where she will receive short, simple, repetitive instructions; will have to concentrate for two hour periods at a time and eight hours in a workday on those short, simple, repetitive instructions; will have only occasional coworker contact or supervision; will have a set routine and procedures, with few changes during the workday; will have only superficial contact with the public on routine matters; and will avoid fast-paced production work. [Dkt. 11-2 at 18.]

Ms. Haddon's only argument not addressed by the ALJ is her claim that she has trouble coming into work at all, or that she would come in late or leave early. But Ms. Haddon's medical records indicate that she has suffered from depression and anxiety since 2008, [dkt. 11-8 at 8], yet she worked full time up until January 2011, [dkt. 11-2 at 38-41]. At the hearing, she testified that she stopped working because she was terminated, and did not mention depression or anxiety as a factor in her decision. [Dkt. 11-2 at 39-40.] She testified further that she received unemployment benefits for about a year after she was terminated, which was also while her disability application was pending, and that she continued looking for a job in social service during that year. [*Id.* at 40.] Her continued employment, coupled with her history of depression and anxiety during that employment, contradicts her claim that those conditions now cause her to be disabled.[7]

---

[7] The ALJ relied partially on the medical records of Dr. Abhyankar in making his RFC determination, but mistakenly stated that Ms. Haddon had seen Dr. Shatagopam instead of Dr. Abhyankar. [Dkt. 11-2 at 19-20.] The Court finds that this error, which is limited to listing the wrong name but correctly characterizing the medical records, is harmless.

As to the effect of her physical symptoms related to allergies, COPD, chest pain, and chronic back pain, Ms. Haddon states in her reply that "I did not question or bring to the attention of [the] ALJ or the vocational expert other impairments. I only stated that the jobs the vocational expert testified to that I could perhaps perform were impossible and I could not perform these jobs due to **Allergies**. I do have other medical conditions that interfere with my abilities to perform certain jobs but I did not state these to [the] ALJ or vocational expert." [Dkt. 20 at 3 (emphasis in original).] Ms. Haddon's claim that allergies, COPD, chest pain, and chronic back pain prevent her from working in any job suffers the same fate as her claim that she suffers from PTSD and Osteoporosis. While she may have been diagnosed at one time with one or more of those conditions, and reported such diagnoses to her more recent medical providers, this does not satisfy her burden of proof.[8]  Additionally, Ms. Haddon has not proven that, even if those diagnoses were supported by current medical records, they significantly limit her ability to perform basic work activities.

Ms. Haddon also objects to the ALJ's reliance on the medical opinions of doctors that the SSA "set [her] up with," because they "only spen[t] one day with [her] out of 365 days per year." [Dkt. 14 at 6.] The ALJ, however, is required not to "ignore these opinions," although it "must explain the weight given to the opinions in [its] decision[]." 1996 SSR LEXIS 3, *2; *see also* 20 C.F.R. § 404.1527. The ALJ explained that Ms. Haddon had only minimal treatment for psychiatric conditions since her alleged date of onset, and the record confirms this. Since January 2011, her only treatment related to her depression and anxiety included a visit to Dr. Abhyankar for a prescription re-fill, in which he noted that she was "pleasant and cooperative; in no acute

---

[8] For example, Ms. Haddon stated during a July 12, 2011 medical exam that she was diagnosed with COPD five years before that. [Dkt. 11-7 at 72.] She does not explain why her COPD now precludes her from working when it did not before, nor does she provide any documentation of a current diagnosis.

distress" and was "[o]riented…[with n]o psychomotor retardation or agitation." [Dkt. 11-8 at 13.] The ALJ went on to state that, due to the fact that Ms. Haddon's treatment for depression and anxiety since her alleged onset date was extremely sparse, he relied heavily on the state agency-requested consultative psychiatric examination by Dr. Roberts-Pittman from July 2011. [Dkt. 11-2 at 20.] The ALJ discussed the findings from this examination in detail, finding that they were inconsistent with Ms. Haddon's characterizations of her condition – for example, Dr. Roberts-Pittman noted no abnormalities in Ms. Haddon's behavior and that she was bright and easy to speak with. [Dkt. 11-7 at 80-86; *see also* dkt. 11-2 at 20-22.] Significantly, the ALJ noted that Ms. Haddon informed Dr. Roberts-Pittman that she was applying for disability "due to my diagnosis of depression, Generalized Anxiety disorder, and PTSD," which she then stated were diagnosed in 2008. [Dkt. 11-7 at 81.] The ALJ stated that her date of diagnosis "significantly predates the claimant's [alleged date of onset] and the claimant's earning record indicates considerable earnings in 2008, 2009, and 2010….These earnings subsequent to her allege diagnoses, but prior to her [alleged onset date], detract from the claimant's credibility as to her alleged symptoms." [Dkt. 11-2 at 20.]

The ALJ also sufficiently considered the opinions of Drs. Larsen, Kladder, Sands, and Hasanadka, and explained his reliance on each. For example, while Dr. Larsen concluded that there was insignificant evidence to form an opinion in April 2011, the ALJ explained that this conclusion was consistent with the fact that the record did not include any treatment for psychiatric conditions since Ms. Haddon's alleged onset date. [Dkt. 11-2 at 22 (also discussing the findings of Drs. Kladder, Sands, and Hasanadka and adequately explaining why those findings were supported by the record).] The Court finds that the ALJ properly relied upon the reports of the agency doctors – and explained that reliance – given the extremely limited evidence Ms. Haddon

provided to indicate any current treatment by her physicians for depression and anxiety. The Court finds compelling the ALJ's conclusion that Ms. Haddon's diagnoses in 2008, coupled with her ability to work for several years after, detract from her credibility regarding a claim of disability now.

In sum, the Court concludes that the ALJ properly accounted for the diagnosed conditions that were severe when formulating Ms. Haddon's RFC. Accordingly, her Step Four challenge fails.[9]

## IV.
### CONCLUSION

The standard for disability claims under the Social Security Act is stringent. "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 364 Fed. Appx. 271, 274 (7th Cir. 2010). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. *Id.* Taken together, the Court can find no legal basis presented by Ms. Haddon to overturn the Commissioner's decision that Ms. Haddon does not qualify for disability, disability insurance benefits, or supplemental security income. Therefore, the decision below is **AFFIRMED**. Final judgment will be entered accordingly.

03/14/2013

*(signature)*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[9] The Court notes that Ms. Haddon argues she was unable to view the medical information provided to her by the SSA, [dkt. 14 at 5]. However, these documents are part of the record filed in this case, and viewable by Ms. Haddon as a party. [Dkt. 11.]

**Distribution via ECF only:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

**Distribution via U.S. Mail:**

REBECCA A. HADDON
410 S. 29th St.
Apt. 7
Terre Haute, IN 47803